■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HARRIS ATTEBERY, Appellant. [637 NYS2d 194] —Appeal by the defendant from a judgment of the County Court, Westchester County (Cowhey, J.), rendered October 29, 1993, convicting him of attempted burglary in the second degree and criminal

mischief in the fourth degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress identification testimony.

Ordered that the judgment is affirmed.

The defendant's contention that there was no probable cause to support his arrest is without merit. Probable cause to arrest exists if the facts and circumstances known to the arresting officer would lead a reasonable person possessing the same expertise as the arresting officer to conclude that it is more probable than not that the suspect has committed or is committing a crime (*see, People v Bigelow*, 66 NY2d 417, 423; *People v Brown*, 173 AD2d 629). "The evidence of criminality need not rise to the level necessary to support a conviction or even be sufficient to establish a prima facie case * * * it need merely appear more probable than not that a crime has taken place and that the one arrested is its perpetrator" (*People v Hill*, 146 AD2d 823; *see, People v Quarles*, 187 AD2d 200).

In this case, Mount Vernon Police Officer Dermid Corbalis was on uniformed patrol in a marked police car on the morning of November 18, 1992, when he received a radio transmission concerning two black males who were ringing doorbells in a certain specified neighborhood. The radio transmission also indicated that the two males had previously been in a certain car. Officer Corbalis saw a car fitting the description he received outside of 660 Hanover Place with a person in the driver's seat. He then looked at the house and saw two black males crouched down by a basement window of the house at 660 Hanover Place.

When Officer Corbalis drove by the house a second time, the car drove away and the two men fled. Officer Corbalis radioed a description of the two men who were arrested shortly thereafter by officers from the Pelham Police Department.

Going from house to house ringing doorbells in a residential neighborhood at a time of day when many residents are away working, accompanied by a driver in a nearby vehicle, and fleeing at the sight of a uniformed officer before the officer had time to take any action, is a well-recognized standard operating procedure for burglars. Common sense, coupled with the totality of the circumstances, fully supports the conclusion that Officer Corbalis had reasonable grounds to believe that the defendant and his companion had trespassed upon the property located at 660 Hanover Place and had attempted to unlawfully enter the house through the basement window for the purpose of burglarizing it.

The defendant's contention that the showup identification was unduly suggestive is without merit. "[A] showup procedure which is less than ideal may be acceptable in the interest of a prompt identification (*People v Duuvon*, 77 NY2d 541; *People v Love*, 57 NY2d 1023; *People v Slade*, 174 AD2d 639), and the record discloses that the showup was conducted in close spatial and temporal proximity to the offense and to the subsequent apprehension of the defendant" (*People v Sanchez*, 178 AD2d 567, 568). Therefore, the showup identification was not improper in this case.

The defendant's remaining contentions are either unpreserved for appellate review or without merit. Balletta, J. P., O'Brien and Copertino, JJ., concur.

Pizzuto, J., concurs with the result only, with the following memorandum: The record of the subject suppression hearing evinces that on the morning of November 18, 1992, Police Officer Dermid Corbalis of the Mount Vernon Police Department was on routine patrol in his marked police vehicle when he received a radio communication that two black males were ringing doorbells in a certain specified neighborhood. Officer Corbalis also received a description of the vehicle which they were using as they circulated through the neighborhood. Upon his arrival at approximately 10:45 A.M., Officer Corbalis observed the subject vehicle parked in front of a private residence located at 660 Hanover Place. As Officer Corbalis approached that address, he observed two black males, one wearing a red-hooded sweatshirt and the other wearing dark, "dungaree type" clothing and carrying a white construction helmet, crouching outside the basement window. When the two men saw the police vehicle, they stood up and fled on foot through the backyard. Officer Corbalis attempted to head them off on the next block and, failing in this, drove after the "getaway" vehicle which had pulled away from its location in front of 660 Hanover Place. Officer Corbalis succeeded in apprehending the subject vehicle which had stopped at a red traffic light two blocks away. After turning custody of the driver, who is not a defendant herein, over to a fellow officer, Officer Corbalis returned to 660 Hanover Place to investigate. Officer Corbalis testified that "no more than two minutes" had elapsed from the time he lost sight of the two suspects to the time he arrived back at 660 Hanover Place. Upon inspection of the premises, Officer Corbalis saw that the basement window was open and its hinges were broken. The screen had been removed and was laying next to the window in a broken condition. In addition, Officer Corbalis observed freshly cut wires next to the window which appeared to be burglar alarm wires.

In the 15 minutes subsequent to his initial arrival at 660 Hanover Place, Officer Corbalis made at least two radio communications describing what he had observed: one to the Mount Vernon Police Department radio dispatcher immediately following the suspects' flight, and one some 15 minutes later to the Pelham Police Department after he had apprehended the driver of the getaway vehicle, returned to 660 Hanover Place, and completed his investigation of the premises. This second radio communication was made directly to Police Officer Anthony Mattesi of the Pelham Police Department at approximately 11:03 A.M. and advised Officer Mattesi that the described suspects had been involved in an attempted burglary.

Within minutes of receiving this second communication, Officer Mattesi observed the defendant, who was wearing a red hooded sweatshirt, and the codefendant, who was wearing a denim jacket and jeans. Significantly, Officer Mattesi and Pelham Police Officer Darryl Jackson both specifically testified that they did not see either the defendant or the codefendant in possession of a white construction helmet. The defendant was standing adjacent to the sidewalk in front of a private residence located at 411 First Avenue, and the codefendant was standing in the doorway. The residence was less than one-half of a mile from 660 Hanover Place. Upon Officer Mattesi's approach, the defendant and codefendant fled, running directly into the residence. Officers Mattesi and Jackson followed the two men into the residence. The defendant was apprehended when Officer Jackson drew his weapon, told him to freeze, and the defendant complied. The defendant was then handcuffed and taken outside of the house to await the arrival of Officer Corbalis, who was informed via radio that the Pelham police had apprehended the two suspects. The Pelham police officers requested that Officer Corbalis "respond to make a positive or negative identification". Officer Corbalis responded to the scene within one minute after the defendant was brought out of the house, and identified the defendant as one of the individuals he had seen attempt to burglarize 660 Hanover Place. At the time of this showup identification, the defendant was handcuffed and standing outside of a police vehicle. After Officer Corbalis rendered this identification, Officer Jackson turned custody of the defendant over to him.

Based upon these facts, the Supreme Court denied the defendant's suppression motion finding that the defendant's arrest was effectuated by the Pelham police officers, the arrest was supported by probable cause, and the subsequent corporeal

identification was not unduly suggestive. While I disagree with the conclusion reached by the Supreme Court and my colleagues in the majority with reference to the point in time that the defendant was placed under arrest, I agree that the Supreme Court's denial of the suppression motion was the correct disposition.

The information possessed by the Pelham police officers at the time that they arrived at 411 First Avenue provided them with a reasonable suspicion that the defendant was one of the individuals who had attempted to burglarize 660 Hanover Place (see generally, CPL 140.10; People v Holmes, 81 NY2d 1056; People v Allen, 73 NY2d 378). As such, Officers Mattesi and Jackson were authorized to stop and detain the defendant for the purpose of conducting a showup identification procedure (see, People v Hicks, 68 NY2d 234). Upon the defendant's flight, the officers were justified in pursuing the defendant for the purpose of forcible apprehension and detention (see, People v Martinez, 80 NY2d 444, 447; People v Leung, 68 NY2d 734, 736; People v Norman, 199 AD2d 5).

Contrary to the conclusion reached by the Supreme Court and my colleagues in the majority, the defendant was not arrested at the moment he was forcibly apprehended and detained by Officer Jackson. The mere fact that a show of force (i.e., Officer Jackson's drawing of his weapon), was necessary to convince the defendant to capitulate to the lawful exercise of police authority did not, by itself, "transform the lawful detentive stop into an arrest since the reasonableness of the officers' conduct must be viewed against the realities of the dangers posed" by the situation with which they were confronted (People v Clark, 172 AD2d 679; see also, People v Allen, 73 NY2d 378, 380, supra; People v Davis, 161 AD2d 602). Where police officers find themselves in a rapidly developing and dangerous situation posing an imminent threat to their safety, they must be permitted to take reasonable measures to assure their safety (see, People v Allen, supra). Here, the Pelham police officers were lawfully pursuing two suspects into a strange house and the drawing of Officer Jackson's weapon was the quickest manner in which to effectuate the lawful stop of the defendant and thereby gain control of a potentially life-threatening situation. Similarly, placing the defendant in handcuffs for the one minute it took for Officer Corbalis to respond to the scene was neither gratuitous nor prolonged and constituted a reasonable security measure under these circumstances (see, People v Allen, supra).

Without question, Officer Jackson's apprehension of the de-

fendant constituted a "seizure" of the defendant's person as that term has been defined by the Court of Appeals (*see, People v Bora*, 83 NY2d 531, 534-535). However, under the facts of this case, the seizure was limited in scope and lawfully effected (*see, People v Martinez*, 80 NY2d 444, *supra; People v Allen, supra; People v Clark, supra; People v Davis, supra*). Once Police Officer Corbalis identified the defendant as one of the individuals he had observed at 660 Hanover Place, there existed probable cause to place the defendant under arrest (*see generally, People v Hollman*, 79 NY2d 181, 185; *People v Hicks*, 68 NY2d 234, 238, *supra*; CPL 140.10).